STATE OF MISSOURI, Respondent, *v.* T. L: PARSONS AND OLIVER HARRIS, Appellants.

### May 16, 1882.

1. Proof that two employees of a corporation were doing an unlawful act will not warrant an inference of guilty knowledge on the part of the president of the corporation.
2. The refilling of branded barrels with oil, constitutes the offence under the statute without reference to whether the accused intended to defraud the citizens of the state of Missouri.
3. A failure of the inspector to properly inspect the oil before branding the barrels is no defence to an action for illegally refilling such barrels.
4. The information being sufficient under either statute, it is immaterial whether one act repeals some provisions of the other.

APPEAL from the St. Louis Court of Criminal Correction, CADY, J.

*Affirmed as to Harris ; reversed as to Parsons.*

E. McGINNISS, for the appellants : The barrels of oil were for shipment and use out of the state, and the inspection law does not apply to such cases. — *The State* v. *Waters*, 5 Mo. App. 578. The barrels were, in law, never branded, because their contents were never inspected as the law requires, and the inspector is expressly forbidden by the statute to brand a barrel unless he has first inspected its contents and ascertained the fire test of the oil in that barrel. It is no offence to fill such barrel. — Rev. Stats., sects. 5839, 5840 ; *Pacific Guano Co.* v. *Dawkins*, 57 Ala. 115. The clause of the statute on

which the information is based, was repealed by a later statute before the offence is alleged to have been committed.— Rev. Stats., sect. 5843; Sess. Acts 1881, p. 141; *United States* v. *Case*, 1 Paine, 400.

Davenport & Napton, for the respondent.

Thompson, J., delivered the opinion of the court.

This was an information in the St. Louis Court of Criminal Correction against Theodore L. Parsons, Oliver Harris, Neil Elder, Morris Conners, and John Reeves, for knowingly using ten barrels, having thereon the brand of the coal oil inspector, the contents of which had never been actually inspected. The information appears to have been brought under the statute of 1881, which reads as follows : "Any merchant, dealer, or other person who shall imitate the contents of any barrel, can, or other package containing petroleum oil, kerosene, gasoline, or any product of petroleum, sold or to be sold, or used for illuminating purposes, bearing the brand of any inspector of petroleum in this state, 'Approved Standard Oil,' as required by the laws thereof, shall, at and before said barrel, can, or other package, branded as aforesaid, may be disposed of or passed out of his, her, or their possession, erase and cancel the inspector's brand thereon ; and such person or persons, and any and all other person or persons whatever, who may be in possession of said barrel, can, or other package, shall not, without having first erased and cancelled the inspector's brand, refill, or knowingly permit any other person to refill, any such barrel, can, or package, branded as aforesaid, with petroleum oil, kerosene, gasoline, or any product of petroleum, sold or to be sold, or used for illuminating purposes ; and any person or persons who may violate the provisions of this section, shall be deemed guilty of a misdemeanor, and on conviction thereof, as provided in section 5846 of the Revised Statutes, punished," etc.

A *nolle prosequi* was entered as to the defendants Conners.

and Reeves; the defendants Parsons and Harris were con-
victed, and the defendant Elder was acquitted.

1. The first ground on which we are asked to reverse
the judgment is, that there is no evidence to sustain the
verdict, and that an instruction offered by the defendants,
directing the jury to render a verdict of not guilty, ought
to have been given.   Looking through the testimony as
preserved in the bill of exceptions, we are satisfied that
there was substantial evidence to support the verdict
against the defendant Harris, and that the evidence would
also have warranted a verdict against the defendant Elder,
who was acquitted.   But we do not see any substantial
evidence connecting the defendant Parsons with the unlaw-
ful act charged in the information, showing that he had
any knowledge of it, that he had authorized it to be done,
or that he had ever authorized, sanctioned, or permitted
the doing of any similar act.   On the contrary, his own
testimony, as well as that of his co-defendant Harris, goes
to discharge him of any connection with the offence, or
of any guilty knowledge or unlawful purpose connected
therewith.

The only substantial testimony for the state which re-
lated directly to the fact of the offence, was that of Mr.
McIntire, the coal oil inspector for St. Louis.   He testi-
fied as follows:  "On the 4th of November, 1881, between
half-past three and four o'clock, I went to the Parsons Oil
Company, which was situated at 1033 North Main Street,
in the city of St. Louis, — it was below Biddle Street, I
think.  I saw Mr. Elder filling coal oil into one of my bar-
rels, branded 'Joseph McIntire, Proof Standard Oil, Nov.
4th, 1881, to ignite at 150 temperature.'   I asked him what
he was doing.   He said : 'Filling oil into a barrel.'  I said :
'What kind of oil?'   He said : '150 oil.'   By that time the
barrel had become full, and he bunged it up.   I asked him
where Oliver Harris was.   He said : 'Up stairs;' and he
called him down.   When Harris came down, I said : 'What

kind of oil is this in this barrel?' He said: '150.' Said I, 'I wish you would be kind enough to take a sample out.' He opened it and took a sample out. He then called to Conners here and said: 'Why in hell haven't you painted this brand out?' I told him: 'You had no right to do that; that my inspector has been here and inspected fifty-six barrels — fifteen on the first floor and forty-one on the second floor.' After I had taken the sample of oil, Oliver Harris said to me: 'That is only 110 oil, Mr. McIntire.' Q. 'What did you take the sample for?' A. 'To make a test. There was a doubt in my mind as to what kind of oil it was.' I went into the office and saw the book-keeper — I believe it was Mr. Bailey. As I opened the door he smiled and laughed, and I asked him: 'Who has charge here during Mr. Eime's absence?' Mr. Bailey pointed to Mr. Parsons. He said: 'Mr. Parsons has charge.' There were a number of persons in the office, and I told Mr. Parsons I would like him to step out, as I would like to see him. When he stepped out I asked him if he knew what was going on here. He said: 'No; what is it?' I said they had been filling these barrels after my man had been there guaging them. He said he did not know anything about it. In the meantime, while I was standing there, Oliver Harris, the foreman, instructed Morris Conners, one of the workmen there, to paint the inspection brand off these ten barrels. My man had inspected fifty-six barrels that day — fifteen were down stairs and forty-one were on the second floor." He also testified that the brand on the barrels at the time when he thus caught Elder refilling them was, " Approved Standard Oil; ignites at 150 temperature;" and that the oil which he was thus putting into them, proved, upon inspection, to be oil of a grade of 110 or 113. The evidence showed that Harris was the foreman of the store, and that Elder, in doing what he did, acted under Harris's orders. But there was no evidence connecting Mr. Parsons with the offence, ex-

cept the fact that he was president of the company, and that he was in the office part of the store at the time. The evidence tends to show that Mr. Harris, as foreman of the establishment, had exclusive charge of the matter of attending to shipments, of filling and refilling barrels, etc., and that Mr. Parsons had nothing to do with these details. There was no direct evidence, and no evidence as to the general course of the business of the Parsons Oil Company, from which it could be fairly inferred that Mr. Parsons had any knowledge of the doing of this act; that he had authorized the doing of it, or, generally, the doing of any similar act or acts; no evidence, in short, connecting him with the offence, beyond the mere fact that he was president of the corporation, and was in another part of the building at the time when it was done. In a criminal case, where a necessary element of the offence is guilty knowledge or unlawful intent, something more than this must be shown. Under a rule of evidence which would sustain the verdict against him in this case, innocent men might frequently be convicted and disgraced. The president of a bank might be ruined by a crime committed by its cashier or teller, without having any connection with it, other than the fact that he was president of the bank, and was in his room in the bank at the time when the crime was committed. From the evidence of Mr. McIntire, the jury might well have inferred a guilty intent on the part of both Harris and Elder; for, when first questioned, they both answered falsely that the barrel was being filled with oil of a test of 150°. And from this, the jury probably inferred that these two employees of the company would not be likely to be knowingly engaged in the doing of an unlawful act without being thereto authorized by the president of the company. But we think this inference not strong enough to overcome the presumption of innocence which the law throws around every one, especially in the face of the positive evidence which the defendants

produced to the contrary. We shall, therefore, reverse the judgment as to Mr. Parsons, and direct that he be discharged.

It is no objection to the verdict which we can consider, that, although Elder was just as guilty as Harris, yet the jury acquitted Elder and convicted Harris. They probably thought that the policy of the law would be satisfied by the conviction of those whom they deemed principal actors, without including in their verdict a laborer who acted as he did,·in obedience to orders, the refusal to obey which might have cost him his situation.

2. Next it is claimed that the court erred in refusing to instruct the jury, " that it is not unlawful to fill a branded barrel with oil to be sold, without being inspected by the inspector, to any person in this state, to be shipped outside of this state, and to be used for illuminating or other purposes outside of this state." It is scarcely necessary to discuss such a proposition. So to hold would, in effect, repeal the statute under which this proceeding is instituted; for it would only be necessary for a person proceeded against under it to swear, or procure his employees to swear, to an ulterior intent of shipping the oil containing the false brand to another state. As the existence of such an intent could never be disproved by the state, this could be made by dishonest dealers an effective defence in all cases. The offence denounced by this statute is complete when a barrel containing an inspector's brand is refilled with other oil, and is not discharged by the fact that it may have been the intent of the wrongdoer to defraud and imperil the lives of citizens of another state, instead of citizens of this state. This statute says nothing about the state in which the oil is to be sold or used. It is just as bad in point of morals, and just as injurious to the commercial reputation of our citizens, to send packages containing false marks and brands to another state for sale, as to sell them to citizens of this state.

In justification of this position, the defendants appeal to

the decision of this court in *The State* v. *Waters* (5 Mo. App. 578). There is nothing in that case whatever that justifies this contention. That was an information under a statute making it a misdemeanor " to sell to any person in this state," illuminating oils, without having the same inspected. The facts agreed upon in that case show that the sale in question was not made to any person in this state, but to persons in Texas. That case was, then, not only not within the statute, but there was nothing wrong in morals in selling such oils to a person in another state which had not been inspected. There was no selling under false brand, — no representation through the fraudulent use of an inspector's certificate, that the oil was of a higher test than it bore in fact; and it was held, on obvious grounds, that the inspection laws of one state have no operation in another state.

3. It is next contended that there can be no recovery, because these barrels had not in fact been " branded " as required by law. And it is said that they had not been so branded because they had not been lawfully inspected. The evidence disclosed that this particular lot of barrels had been inspected in this way : " By going over the barrels and taking a little out of each barrel and mixing it all up in one sample, and making one single test out of it." The deputy inspector did not see or know where the oil came from that had been put in each barrel. He just drew a little out of each barrel and mixed it all up in a cup, and from this cup he took a small quantity in the glass instrument with which he made the test; and if this test showed that the sample did not ignite at a less temperature than 150°, he put that brand on each barrel. He was then asked the following question : " Say, for instance, there are fifty-six barrels, and that six barrels are 110 oil, and that twenty are 150 and that the balance are 175 oil, — would not your average flash test be 150, and would not you put your brand of 150 oil on

to 110 oil?" To which the deputy inspector answered: "Yes, if it had been mixed in that way; but as the barrels come in, I can tell pretty near what they are by looking at the packages — tell the different lots, whether they belong to one lot or not — the different inspector's or guager's brand in the east. An eastern man puts his brand on, and I can tell where that comes from." The defendant's counsel then questioned him in this way: "The eastern man may have put on that brand wrong. Is there any other way for you to tell, except by inspecting, what that grade of oil is? Is it not a mere guess?" To which the witness returned the following unsatisfactory answer: "I say, if there is anything less than 150 mixed in that lot, it will bring my test down." The testimony of the inspector indicates that a good deal of the oil inspected by his deputy — and the inspector made no inspections personally — was inspected in this way.

This was little better than no inspection at all. It is not such an inspection as the statute (2 Rev. Stats., sect. 5839) contemplates or requires. No doubt it places some check upon the dishonesty of dealers; but it would be a delusion to suppose that it affords an adequate protection to the public. For aught that this deputy inspector knew, as shown by the testimony above given, half a dozen or more of these very barrels on which he had put his brand of 150, may have contained oil of no higher grade than 110, the use of which, for illuminating purposes, would have been, as is well known, hazardous to human life. But, although the inspector or his deputy may have failed in his duty, we know of no principle on which these defendants can urge the delinquency of the officers as an excuse for their own violation of the law. A man indicted for the forgery of a United States treasury note of a particular number, might as well seek to defend his crime on the ground that the original note which he had imitated, had never, in fact, been issued from the treasury for value received by the

government, but that it had been put in circulation through the official delinqueney of the treasurer. If these defendants, or any of them, have committed a misdemeanor, it is no defence to show that some one else has committed a different kind of a misdemeanor with reference to the same subject-matter. With each successive misdemeanor the public rights are violated, and the public peril accumulates.

4. Finally, it is urged that the clause of the statute on which the information is based, was repealed by a later statute before the offence was alleged to have been committed. This argument rests upon the supposition that the information in this case is based upon that part of section 5843 of the Revised Statutes, which makes it a misdemeanor to " use any package having the inspector's brand thereon," with intent to defraud, " without having the contents thereof actually inspected." It is supposed that this statute was repealed by the act of 1881, which we have quoted at the commencement of this opinion, which was passed before this offence is alleged to have been committed. We do not think that this position is well taken, nor do we deem it material to inquire whether the new statute repeals, by implication, the old one or not. Our impression would be that it does not, — that it was merely framed for the purpose of supplementing and making stronger and clearer the provisions of the old. But however this may be, we see no force in the point, because, in our judgment, the information charges an offence under either the old or the new statute.

As to the defendant Harris, the judgment will be affirmed. As to the defendant Parsons, it will be reversed, and the defendant discharged. All the judges concur.